IN RE: RALPH ROBERTS REALTY, LLC, Debtor.

Ralph Roberts Realty, LLC, Plaintiff,

v.

Jon Savoy, et al., Defendants.

Case No. 12–53023
Adv. Pro. No. 12–6131

United States Bankruptcy Court,
E.D. Michigan, Southern Division.

Filed 10/14/2016

Hannah Mufson McCollum, Stuart A. Gold, John C. Lange, Gold, Lange & Majoros PC, Southfield, Michigan, Attorneys for Plaintiff.

Scott M. Kwiatkowski, Goldstein Bershad & Fried PC, Southfield, Michigan, Attorney for Defendant.

## TRIAL OPINION

Thomas J. Tucker, United States Bankruptcy Judge

### I. Introduction

This adversary proceeding arises out of the participation of the Defendants in an investor program run by Plaintiff/Debtor Ralph Roberts, Realty, LLC ("Realty") (the "Investor Program"). The Defendants are Jon Savoy; Arnold Hassig, a.k.a. Butch Hassig; Adam Hassig; and four entities formed by them—Prime Residential Properties Group, LLC; Ryan Residential Properties Group, LLC; Adam Residential Properties Group, LLC; and 1836 Brys, LLC (collectively, the "Defendants"). Defendants' participation in the Investor Program was under an oral agreement entered into before Realty filed bankruptcy. Some of the Defendants purchased sixteen real estate properties under the Investor Program. Realty seeks a judgment against all Defendants, jointly

and severally, (1) declaring that 30% of any profits made on the sale of any properties purchased under the Investor Program that had not already been sold as of the date the adversary complaint are property of the bankruptcy estate (Count I);[1] (2) an accounting of the funds received from the prepetition sale of three of the properties purchased under the Investor Program (Count II); and (3) the turnover, under 11 U.S.C. § 542, of not less than $100,500.00 allegedly owed for the profit split on properties purchased under the Investor Program that were resold (Count III).[2]

The Court held a bench trial, which involved a day of opening arguments and the presentation of evidence,[3] followed by briefs,[4] and then a later date on which counsel made oral closing arguments.

The Court has considered all of the arguments of the parties; all of the exhibits admitted into evidence at trial, namely Plaintiff's Exhibits 1 through 15 and Defendants' Exhibits A through M, O, P, and Q;[5] and all of the testimony of the witnesses, namely Ralph Roberts, Raymond Confer, and Defendant Jon Savoy.

This opinion constitutes the Court's findings of fact and conclusions of law. For the reasons stated in this opinion, the Court will enter a judgment in favor of Plaintiff Realty and against certain of the Defendants, but for less than the full relief sought.

## II. Jurisdiction

This Court has subject matter jurisdiction over this adversary proceeding under 28 U.S.C. §§ 1334(b) and 157(a), and Local Rule 83.50(a) (E.D. Mich.). The parties agree with this, and in their Rule 26(f) Reports filed early in this case, the parties agreed that this adversary proceeding is a core proceeding.[6]

To date, the Court has deferred making a determination as to whether or to what extent this adversary proceeding is a core proceeding. It now turns out to be unnecessary to do so, because the parties all have consented to the Bankruptcy Court entering a final judgment or final order in the adversary proceeding under 28 U.S.C. § 157(c)(2), to the extent any claim is non-core.[7]

In recent years, the legal landscape regarding a bankruptcy court's authority to enter final judgments and orders has changed, because of the United States Supreme Court's decisions in *Stern v. Marshall* and later cases. *See Stern v. Marshall*, 564 U.S. 462, 131 S.Ct. 2594, 2601, 2620, 180 L.Ed.2d 475 (2011) (holding that

---

1. In Plaintiff's complaint, Plaintiff sought a judgment declaring that 33% of any profits made on the sale of any properties under the Investor Program was property of the bankruptcy estate. (Docket # 1 at 7–8 ¶ 47.) Plaintiff has modified that claim, and now seeks a declaration that 30% of such profits are property of the estate. (Pl.'s Post–Trial Br. (Docket # 62) at 7 ¶ 49.)

2. The $100,500.00 figure was calculated based on a profit split of 33%. (See Compl. (Docket # 1) at 6 ¶¶ 29–37.) However, all parties now agree that the correct profit split percentage under the Investor Program is 30%. *See supra* note 1.

3. Transcripts of the trial are filed at Docket ## 61 and 67.

4. Docket ## 62, 63, 64.

5. In this opinion, citations to Plaintiff's trial exhibits will be in the form "PX–_" and citations to Defendants' trial exhibits will be in the form "DX–_".

6. "Report of Parties' Rule 26(f) Conference" (Docket # 17) at 2 ¶ 4(b).

7. *See id.* at 3 ¶ 4(c); *see also* Adversary Proceeding Scheduling Order (Docket # 18) at 1 § I (b).

bankruptcy courts lack constitutional authority to enter final orders and judgments on certain types of claims that are designated as "core" proceedings under 28 U.S.C. § 157(b)(2)); *Exec. Benefits Ins. Agency v. Arkison*, — U.S. —, 134 S.Ct. 2165, 2168, 189 L.Ed.2d 83 (2014) (holding that, consistent with the Constitution, bankruptcy courts can adjudicate *Stern* claims as "non-core" proceedings, and enter "proposed findings of fact and conclusions of law to be reviewed de novo by the district court"); *Wellness Int'l Network, Ltd. v. Sharif*, — U.S. —, 135 S.Ct. 1932, 1948–49, 191 L.Ed.2d 911 (2015) (holding that "Article III [of the Constitution] permits bankruptcy courts to decide *Stern* claims submitted to them by consent" and that consent need not be express but may be implied "based on 'actions rather than words.'").

■ In the wake of the *Stern, Arkison,* and *Wellness* cases just cited, there are three classes of claims:

(1) claims that are defined as "core" proceedings by 28 U.S.C. §§ 157(b)(1) and 157(b)(2), on which bankruptcy courts have both statutory and constitutional authority to enter final judgments under *Stern*;

(2) claims that are defined as "core" proceedings by 28 U.S.C. §§ 157(b)(1) and 157(b)(2), but on which bankruptcy courts do *not* have constitutional authority to enter final judgments under *Stern*, absent consent of all the parties as permitted under *Wellness* (referred to below as "*Stern*-core claims"); and

(3) claims that are defined as non-core proceedings under 28 U.S.C. §§ 157(b) and 157(c), on which bankruptcy courts do not have statutory or constitutional authority to enter final judgments, ab-

sent consent of all the parties as permitted under 28 U.S.C. § 157(c)(2).

■ In the *Arkison* case, cited above, the Supreme Court held that claims of the type described in item (2) above are to be treated like claims of the type described in item (3) above (*i.e.,* as non-core claims subject to the procedures of 28 U.S.C. § 157(c).) *Exec. Benefits Ins. Agency v. Arkison*, 134 S.Ct. at 2173. Thus, with respect to claims of the type described in both item (2) and item (3) above (*Stern*-core claims and statutory non-core claims), the following procedures apply, under 28 U.S.C. § 157(c): if all parties consent to the bankruptcy court entering a final judgment on such claims, under § 157(c)(2), then the bankruptcy court may do so; otherwise, the bankruptcy court must follow the procedure of § 157(c)(1), and submit proposed findings of fact and conclusions of law to the district court, for the *de novo* review described in § 157(c)(1).

Given the parties' consent in this adversary proceeding, no matter which of the three categories the claims in this adversary proceeding fall under (core; *Stern*-core; or non-core), the law is now clear that this bankruptcy court has statutory and constitutional authority to enter a final judgment. This makes it unnecessary for this Court to determine which category the claims fall under, so the Court will make no such determination.

## III. Background and facts

Ralph Roberts ("Roberts") is a real estate broker and the owner of Realty.[8] Prepetition, in the summer of 2009, Defendants, through Roberts, entered into an oral agreement with Realty to participate in Realty's Investor Program.[9] Certain of

---

8. Trial Tr. (Docket # 61) at 8 ln.10 (Testimony of Roberts).

9. *See* Trial Tr. (Docket # 61) at 9 lns. 8–9 (Testimony of Roberts) (Investor Program started June 1, 2009), 156–57 (Testimony of

the Defendants purchased sixteen real estate properties through Realty's Investor Program.[10] With the possible exception of Raymond Confer, Defendants were the first investors under the Investor Program.[11]

## A. The terms of the Investor Program as between Realty and Defendants, on which the parties agree [12]

In large part, the parties agree on what the terms of the Investor Program were that they orally agreed to. But they dispute some of the terms. The undisputed terms on which the parties agree include the following. Under the Investor Program, Realty searched for and researched distressed properties in Wayne, Macomb, and Oakland counties, which might be sold at sheriffs' sales for below-market prices. Realty tried to identify properties that it believed could be purchased and resold at a profit, and to present those properties to the investors in the Investor Program.[13] Three times a week, Realty would provide a list of properties to the investors, by email. Those investors who were interested in a particular property would then e-mail Realty back indicating their interest and the price they were willing to pay for the property. If an investor's money for the opening bid and any overbid on the property being sold was not already in Realty's trust account, Realty would require the investor to wire Realty the money for the opening bid and any overbid, or to bring to the office a cashier's check in the amount the investor was willing to bid, no later than 10:00 a.m. on the morning of the sheriff's sale. Alternatively, if the investor was attending the sheriff's sale with Realty's Ralph Roberts, the investor could bring to the sale the amount of cash or a cashiers check to cover the amount of the opening bid or any overbid to the sheriff's sale. Roberts would attend the sheriff's sales and bid on the property at the desired price of the investor.[14] If Roberts was the successful bidder, the property would be acquired by the investor personally or by an entity created by the investor. Any investor who became the successful bidder at a foreclosure sale on one of the properties would owe Realty a $5,000 "Acquisition Fee," payable in two installments. The first $2,500 installment was due at the time the investor received a sheriff's deed for the property. The second $2,500 installment was due when the statutory redemption period expired and legal title vested in the investor, or upon closing when the property was resold.[15] If a prop-

---

Jon Savoy ("Savoy")) (Defendants became participants in the Investor Program in August 2009); Defs.' Post–Trial Br. (Docket # 63) at 1 (Defendants became participants in the Investor Program in August 2009).

10. Final Pretrial Or. (Docket # 36) at 7 ¶ 4.a (Stipulation of Facts and Law).

11. Pl.'s Post–Trial Br. (Docket # 62) at 2 ¶ 4; Trial Tr. (Docket # 61) at 194 ln. 24 through 195 ln. 1 (Testimony of Savoy).

12. Some of the terms of the Investor Program were different for the Defendants than for later participants in the Investor Program.

13. *See* Trial Tr. (Docket # 61) at 8–9 (Testimony of Roberts), 157 lns. 5–15 (Testimony of Savoy). At the inception of the Investor Program, the Defendants and Roberts desired and believed that the properties Defendants purchased would be flipped, not rented. *See id.* at 12 lns. 22–25 (Testimony of Roberts), 161 ln. 19 through 162 ln. 6 (Testimony of Savoy). However, in some cases, it was necessary for the Defendants to rent the property for a period of time after their purchase of the property, because they could not flip them. *Id.* at 162 lns. 5–6 (Testimony of Savoy).

14. Trial Tr. (Docket # 61) at 8 ln. 22 through 9 ln. 5; 17 ln. 7 though 21 ln. 24 (Testimony of Roberts).

15. Trial Tr. (Docket # 61) at 110 lns. 17–24 (Testimony of Roberts), 157 ln. 22 through 158 ln. 12 (Testimony of Savoy).

erty was redeemed, such that the investor would not require ownership of the property, the investor was entitled to a $2,500 credit toward the Acquisition Fee charged on any property purchased in the future under the Investor Program.[16] When a property was sold, the investor also was obligated to pay Realty 30% of the investor's profit, meaning 30% of the difference between the investor's purchase price and the sale price, less certain approved expenses.[17] In calculating the profit, Defendants Butch Hassig and Jon Savoy, and no other investors, were allowed a $5,000 credit referred to as a "seller's fee," which they would share,[18] and Defendants Butch Hassig and Jon Savoy, and no other investors, also were entitled to receive interest on the principal investment used for the purchase from the date of the acquisition of the property.[19] If Realty was used as a broker in selling the property, it was entitled to be paid a realtor commission.[20] Realty also agreed to pay Kelly Savoy, who worked for Defendant Jon Savoy, $500 on each closing, because she handled the closings.[21]

## B. Disputed terms of the Investor Program

Certain terms of the Investor Program are in dispute. The parties disagree on what expenses are allowed to be deducted for purposes of the profit split calculation. Realty alleges that there were different ways of calculating the profit split depending on whether the property was purchased and then resold without first being rented ("flipped"); purchased, rented, and then resold; or purchased and then resold under a land contract. If the property was flipped, according to Realty, Defendants were permitted to deduct all of the allowable expenses such as repairs, improvements, commissions, closing fees, interest, insurance, property taxes, utilities, and maintenance fees. However, if the property was purchased, rented and then resold, or resold on a land contract, according to Realty, Defendants were only entitled to deduct the Acquisition Fee, commissions, normal closing costs, and transfer tax, but no other expenses, from the profit calculation.[22] With regard to a land contract sale, Realty alleges that its portion of the profit split was to be paid after the investor had received his portion of the profit, either in cash or by the investor assigning the land contract to Realty.[23] According to Realty, certain expenses—accounting fees, licensing fees, meals and entertainment, service charges, professional fees, and office supplies—were not to be deducted for the purpose of calculating any profit split, re-

16. Final Pretrial Or. (Docket # 36) at 3 (Plaintiff's claims)("[I]f a property was redeemed by a homeowner, Plaintiff would credit the $2,500 paid by Defendants toward the Acquisition Fee for any property purchased by Defendants in the future."); Trial Tr. (Docket # 61) at 36 ln. 17 through 37 ln. 3 (Testimony of Roberts), 177 lns. 3–11 (Testimony of Savoy).

17. Trial Tr. (Docket # 61) at 34 ln. 5 (Testimony of Roberts), 158 lns. 6–12 (Testimony of Savoy). As discussed *infra* in part III.B, the parties disagree on what expenses Defendants were allowed to deduct in calculating the profit.

18. *Id.* at 34 lns. 5–8 (Testimony of Roberts).

19. *Id.* at 34 ln. 17 through 35 ln. 5, 110 ln. 25 through 111 ln. 4 (Testimony of Roberts), 159 lns. 1–3 (Testimony of Savoy).

20. *See id.* at 160 ln. 21 (Testimony of Savoy).

21. *Id.* at 34 lns. 8–16 (Testimony of Roberts).

22. Trial Tr. (Docket # 61) at 13 ln. 15 through 15 ln. 4, 82 ln. 19 through 83 ln. 22 (Testimony of Roberts), 136 ln. 6 through 137 ln. 11, 143 ln. 21 through 146 ln. 5, 151 lns. 3–9 (Testimony of Raymond A. Confer).

23. *Id.* at 14 lns. 15–22 (Testimony of Roberts).

gardless of whether the property was flipped, rented than resold, or resold on land contract.[24]

Defendants, on the other hand, allege that there was only one way of calculating the profit split. According to Defendants, all expenses incurred during their ownership and sale of the properties were allowed to be deducted in this calculation, no matter whether the investor flipped a property, rented the property then resold it, or resold the property under a land contract.[25] And Defendants allege that in calculating the profit split, they were allowed to deduct any expenses that could be deducted for the property as a business expense on a tax return, including accounting fees, licensing fees, insurance premiums, utilities, repair and maintenance costs, city inspection fees, title insurance, meals and entertainment, service charges, and office supplies.[26] Defendants allege that Ralph Roberts never discussed with them any different way of calculating the profit split, that they always calculated the profit split the same way, and that the first time they ever heard of there being different ways of calculating a profit split was during trial.[27]

The parties also disagree as to whether Defendants had a right of first refusal— *i.e.*, a right to be first among all investors in picking properties. Realty alleges that

Defendants had no such right.[28] Defendants allege that they did.[29]

The parties also disagree about whether they were to share losses under the Investor Program. Defendants allege that they were entitled to a 100% credit for any losses they incurred on any property.[30] Realty denies this, and contends that its oral agreement with Defendants did not provide for any sharing of losses.

The parties also appear to disagree as to when the profit split was to be paid, where a property was resold on a land contract. Realty alleges that at the point in time when all that was left to be paid by the land contract vendee on the land contract was the profit split amount owed to Realty, Defendants were required to pay Realty in cash for the amount owed under the profit split or alternatively, were required to assign the land contract, or the payments under the land contract, to Realty.[31] Defendants, on the other hand, appear to allege that in a land contract situation, the profit split was to be paid out of the final, land contract balloon payment.[32]

## C. The properties Defendants purchased under the Investor Program

Defendants purchased the following sixteen properties under the Investor Program:

24. *Id.* at 41 lns. 1–22, 70 lns. 3–15, 73 ln. 25 through 74 ln. 1, 105 ln. 5 through 107 ln. 15 (Testimony of Roberts).

25. *Id.* at 186 lns. 11–13 (Testimony of Savoy); Defs.' Post–Trial Br. at 8.

26. Trial Tr. (Docket # 61) at 159 lns. 12–21 (Testimony of Savoy).

27. *Id.* at 186 lns. 4–22 (Testimony of Savoy); Defs.' Post–Trial Br. at 8, 10.

28. *Id.* at 20 lns. 1–3 (Testimony of Roberts).

29. *Id.* at 161 lns. 8–10 (Testimony of Savoy).

30. *Id.* at 160 ln. 12 through 161 ln. 1, 186 lns. 23–24 (Testimony of Savoy); Defs.' Post–Trial Br. at 3.

31. *See* Trial Tr. (Docket # 61) at 70 lns. 20–25, 126 lns. 14–19 (Testimony of Roberts).

32. *Id.* at 193 lns. 9–12 (Testimony of Savoy); Defs.' Post–Trial Br. at 10 (stating, regarding the properties resold on land contracts, that "[a]ssuming arguendo that all properties were profitable the Plaintiff [would] only be entitled to 30% of the balloon payments after the customary profit calculation").

- 50054 S. Jimmy Ct., Chesterfield, MI 48047 ("Jimmy");
- 23795 Teppert, Eastpointe, MI 48021 ("Teppert");
- 32404 Firwood, Warren, MI 48088 ("Firwood");
- 31805 Raymond, Warren, MI 48093 ("Raymond");
- 11147 Irene Ave., Warren, MI 48093 ("Irene");
- 36403 Ledgestone, Clinton Twp., MI 48035 ("Ledgestone");
- 50355 Foxcrest, New Baltimore, MI 48047 ("Foxcrest");
- 38944 Lowell, Sterling Heights, MI 48310 ("Lowell");
- 2630 Antonia, Warren, MI 48091 ("Antonia");
- 33221 Duncan, Fraser, MI 48026 ("Duncan");
- 7376 Engleman, Centerline, MI 48015 ("Engleman");
- 29179 Trailwood, Warren, MI 48092 ("Trailwood");
- 17463 Breckenridge, Clinton Township, MI ("Breckenridge");
- 17803 Eastland, Roseville, MI ("Eastland");
- 28340 Palm Beach, Warren, MI ("Palm Beach Property"); and
- 27941 Ursuline, St. Clair Shores, MI ("Ursuline").[33]

### 1. Properties that were redeemed

Of the sixteen properties Defendants purchased under the Investor Program, three of the properties were redeemed by the respective homeowners: Breckenridge; Palm Beach; and Ursuline.[34]

### 2. Property that was resold to homeowner

One property that was purchased under the Investor Program at a sheriff's sale—Eastland—was resold to the homeowner after the homeowner filed a lawsuit in Macomb County Circuit Court, and such lawsuit was settled. Realty alleges that there was no loss suffered on Eastland.[35] Defendants allege that they had a $12,879.30 loss on Eastland.[36]

### 3. Properties that were flipped, on which Realty is not seeking any funds over and above what Defendants already paid to Realty under the Investor Program

The first four of the sixteen properties Defendants purchased under the Investor Program were flipped, and Defendants paid Realty what they believed was owed under the terms of the Investor Program. Those properties are Antonia, Foxcrest, Lowell, and Raymond. Realty is not seeking any payment above what Defendants already paid with respect to these properties.[37]

33. *See* Final Pretrial Or. (Docket # 36) at 2 (Plaintiff's claims).

34. *See id.* at 3 (Plaintiff's claims).

35. Trial Tr. (Docket # 61) at 37 ln. 18 through 39 ln. 18, 116 lns. 18–20 (Testimony of Roberts).

36. *Id.* at 188 ln. 14 through 189 ln. 17 (Testimony of Savoy).

37. Final Pretrial Or. (Docket # 36) at 3 (Plaintiff's claims) (Antonia and Foxcrest were "[p]aid as agreed"); Trial Tr. (Docket # 61) at 45 lns. 7–8 (paid everything he was owed on Foxcrest, if $38,000 was the correct number), lns. 11–13 (paid everything he was owed on Antonia and Raymond).

### 4. Properties that are being resold on land contract

As of the time of trial, two of the properties Defendants purchased under the Investor Program were being resold under land contracts: Jimmy, and Duncan.[38] Jimmy was rented for a year and then resold under a land contract.[39] The parties disagree on what expenses can be deducted from the profit split calculation. Realty alleges that Defendants' profit split calculation includes impermissible expense deductions, and that after removing these expenses, the total allowed expenses would be $11,000, and the profit on this property would be $25,000.[40]

As to the Duncan property,[41] Realty alleges that after removing the impermissible expenses in Defendants' profit split calculation, there was a $60,000 profit on Duncan. And Realty says that it is entitled to 30% of that profit—$18,000.[42] Realty alleges that it is currently either owed $18,000 in cash, or that the land contract on Duncan should be assigned to it.[43]

Defendants allege that due to the expenses that can properly be deducted in the profit split calculation, and their right to set off losses on other properties from profits, no money is owed under the Investor Program on either Jimmy or Duncan.[44]

### 5. Other Properties Defendants resold, on which they allege that they owe no money to Realty

Defendants allege that although they resold the following properties they purchased under the Investor Program, they owe no money to Realty on account of the sales: Engleman, Firwood, Ledgestone, and Trailwood.

#### a. Engleman

Engleman was purchased for $17,627.[45] Defendants allege that they spent over $18,000 in repairs on the property.[46] Engleman was rented first and then resold.[47] Defendants allege that they lost just under $40,000 on Engleman.[48] Defendants allege that because they suffered a loss on Engleman, they do not owe Realty any money on account of the sale, and are entitled to set off the loss on Engleman against any profits made on other properties.[49]

Realty alleges that some $35,000 of the expenses that Defendants deducted in their profit split calculation on Engleman are not allowable under the terms of the Investor Program. If these expenses are eliminated from the calculation, Realty alleges, the profit on Engleman was approximately $9,000.[50]

---

38. Trial Tr. (Docket # 61) at 116 lns. 11–13 (Testimony of Roberts), 192 ln. 24 through 193 ln. 4 (Testimony of Savoy).

39. *Id.* at 73 lns. 13–14 (Testimony of Roberts).

40. *Id.* at 74 lns. 10–14 (Testimony of Roberts).

41. *Id.* at 69 ln. 21 (Testimony of Roberts).

42. *Id.* at 70 lns. 13–15 (Testimony of Roberts).

43. *Id.* at 70 lns. 20–25 (Testimony of Roberts).

44. *See* Defs.' Post–Trial Br. at 10–11; Trial Tr. at 197 lns. 17–19 (Testimony of Savoy).

45. Trial Tr. (Docket # 61) at 65 lns. 4–5 (Testimony of Roberts).

46. *Id.* at 165 lns. 13–15 (Testimony of Roberts).

47. *Id.* at 66 lns. 7–8 (Testimony of Roberts).

48. *Id.* at 176 lns. 13–14 ("Just shy of $40,000")(Testimony of Savoy); *See* Defs.' Post–Trial Br. at 6 ("just less than $39,815.05").

49. Defs.' Post–Trial Br. (Docket # 63) at 6.

50. Trial Tr. (Docket # 61) at 67 lns. 16–18 (Testimony of Roberts).

### b. Firwood

Defendants allege that "Firwood was purchased for $28,288 and sold for $84,900" but "due to the numerous errors of the Plaintiff and the contamination of the property[,] this property was not profitable."[51] According to Defendants, because no profit was made on the Firwood property, Defendants do not owe Realty any profit split on this property.[52]

Realty alleges that Firwood was flipped and therefore not all of the expenses Defendants deducted in Defendants' profit split calculation are allowable. Realty alleges that if the non-allowable expenses are eliminated from the profit split calculation, there was a $12,000 profit on this property.[53]

### c. Ledgestone

Defendants purchased Ledgestone for $23,500 and sold it for $69,900.[54] Defendants allege that they made no profit on the sale of Ledgestone because of their expenses, and therefore they do not owe Realty any profit split on this property.[55]

Realty alleges that many of the expenses Defendants used in calculating the profit split on Ledgestone are not allowable, in part, because Ledgestone was rented before it was resold. Realty alleges that if the non-allowable expenses are eliminated from Defendants' profit calculation, the sale of Ledgestone property resulted in a profit of $23,000.[56]

### d. Trailwood

Trailwood was rented before it was resold.[57] Defendants allege that they made a $19,000 profit on Trailwood.[58]

Realty alleges that when all of the non-allowable expenses are eliminated from Defendants' profit split calculation, the profit on the sale of Trailwood was about $81,000.[59]

### 6. Properties not yet sold

Irene and Teppert are properties Defendants purchased under the Investor Program which had not yet been resold at the time of trial.[60] Teppert and Irene were rented to the persons who originally owned them but who lost the properties at a sheriff's sale.[61] Realty estimates that there should be a $22,000 profit on Teppert and an $81,000 profit on Irene, *when* these properties are sold.[62]

Defendants allege that due to the losses they suffered on their other properties, and their right to setoff such losses against

---

51. Defs.' Post–Trial Br. at 7; Trial Tr. (Docket # 61) at 177 ln. 18 through 181 ln. 8 (Testimony of Savoy).

52. Defs.' Post–Trial Br. at 8; Trial Tr. (Docket # 61) at 177 ln. 20 through 178 ln. 1 (Testimony of Savoy).

53. Trial Tr. (Docket # 61) at 60 lns. 4–17 (Testimony of Roberts).

54. *Id.* at 183 lns. 20–23 (Testimony of Savoy).

55. Defs.' Post–Trial Br. at 8.

56. Trial Tr. (Docket # 61) at 59 lns. 1–5 (Testimony of Roberts).

57. *Id.* at 62 ln. 21 through 63 ln. 6 (Testimony of Roberts).

58. *Id.* at 190 lns. 11–18 (Testimony of Savoy).

59. *Id.* at 64 lns. 1–4 (Testimony of Roberts).

60. Defs.' Post–Trial Br. at 11; Trial Tr. (Docket # 61) at 116 lns. 9–10 (Testimony of Roberts).

61. Trial Tr. (Docket # 61) at 79 lns. 6–8 (Testimony of Roberts regarding Teppert), 76 lns 3–5 (Testimony of Roberts regarding Irene), 169 lns. 19–24 (Testimony of Savoy regarding Teppert).

62. *Id.* at 80 lns. 9–22 (Testimony of Roberts regarding Teppert), 76 ln. 1 through 77 ln. 11 (Testimony of Roberts regarding Irene).

profits, they will not owe Realty anything when the Teppert and Irene properties are sold, even if they make a profit, unless and until Realty first pays them approximately $65,000 for the losses they suffered on other properties.[63]

### D. Debtors' bankruptcy cases

On May 25, 2012, Realty and Roberts (collectively, "Debtors"), each filed a voluntary petition for relief under Chapter 11, commencing Case No. 12–53023 (Realty) and Case No. 12–53024 (Roberts). On May 30, 2012, the Court entered an order directing the joint administration of Debtors' bankruptcy cases.[64]

On December 6, 2012, Debtors jointly filed a Fifth Amended Plan.[65] None of the Defendants filed an objection to Debtors' Fifth Amended Plan or a proof of claim. On February 11, 2013, the Court entered an order confirming Debtors' Fifth Amended Plan.[66]

### IV. Discussion

### A. Joint and several liability of certain Defendants

■ As noted at the beginning of this opinion, Plaintiff Realty has named seven defendants in this case—three individuals and four LLCs. Based on the evidence presented at trial, including the testimony of Ralph Roberts,[67] and the names of the Defendants who purchased and resold the properties at issue, discussed below, the Court finds that Defendants Jon Savoy and Arnold ("Butch") Hassig acted jointly in making the oral agreement with Plaintiff Realty regarding the Investor Pro-

gram, and in purchasing all the properties discussed below. And they acted jointly with the particular Defendant LLC entities named below with respect to particular properties.

For these reasons, the Court finds that to the extent there are any sums owed to Realty with respect to any property discussed below, Defendants Jon Savoy and Arnold ("Butch") Hassig are jointly and severally liable to Realty for such sums. And particular Defendant LLCs that participated in purchasing, or holding title to and reselling, any property discussed below on which any sums are owing to Realty, also are jointly and severally liable to Realty for such sums, with Defendants Jon Savoy and Arnold ("Butch") Hassig. The details of this are spelled out more particularly below, in the Court's discussion of each property at issue.

### B. Expenses to be deducted in calculating the profit split under the parties' oral agreement

■ As noted above, the parties dispute what expenses may be deducted in calculating the profit on a property, for purposes of calculating the profit split. On this issue, the evidence is conflicting as to what the oral agreement of the parties was. Details of that dispute are described in part III.B of this opinion, above.

There is a major problem with Realty's version of what the agreement was on this point—namely, that the sworn testimony of Realty's only witness with knowledge of this subject, Ralph Roberts, is inconsistent.[68] Mr. Roberts testified about this

---

63. *Id.* at 192 lns. 1–22 (Testimony of Savoy).

64. Docket # 15 in Case No. 12–53023.

65. Docket # 156 in Case No. 12–53023.

66. Docket # 225 in Case No. 12–53023.

67. *See* Trial Tr. (Docket # 61) at 22, 32–33.

68. Three witnesses testified at trial: Realty's Ralph Roberts; Raymond Confer; and Defendant Jon Savoy. Of these, Raymond Confer testified that he has no personal knowledge of, and does not know, what the Investor

subject on at least three different occasions—during the trial in this case, and twice before the trial in this case. And on each occasion, Mr. Roberts's testimony was materially different. The Court will describe each of the three versions to which Mr. Roberts testified.

## 1. Version 1:

The version that Mr. Roberts testified to at trial is described in part III.B above. It makes a distinction between properties that are "flipped" (resold without first renting them), and properties that are rented, and then resold. Under this version, the deductible expenses for purposes of calculating the profit split are more limited for properties that are rented before they are resold. And under this version, many of the Defendants' types of claimed expenses are not allowed to be deducted for purposes of calculating the profit split.

To summarize this, under this first version ("Version 1"), the following types of expense are allowed and not allowed to be deducted for purposes of calculating the profit split:

|   | Expenses allowed if property is "flipped": | Expenses allowed if property is rented, then resold: |
|---|---|---|
| 1. | $5,000 acquisition fee | yes |
| 2. | $5,000 seller's fee to Defendant(s) | yes |
| 3. | real estate commissions | yes |
| 4. | closing costs, including title recording fees | yes |

Program agreement was between Realty the Defendants in this case. (Trial Tr. (Docket # 61) at 142, 149–50.) (Henceforth, citations in this opinion to "Trial Tr." are to the transcript filed at Docket # 61).

|  | Expenses allowed if property is "flipped": | Expenses allowed if property is rented, then resold: |
|---|---|---|
| 5. | transfer tax | yes |
| 6. | $500 closing fee to Kelly Savoy | yes |
| 7. | $5,000 sellers fee to Defendant(s) | yes |
| 8. | cost of repairs | no |
| 9. | cost of improvements | no |
| 10. | interest on purchase price | no |
| 11. | insurance | no |
| 12. | property taxes | no |
| 13. | utilities | no |
| 14. | no legal fees | no legal fees |
| 15. | no accounting fees | no accounting fees |
| 16. | no service charges | no service charges |
| 17. | no meals and entertainment | no meals and entertainment |
| 18. | no license fees | no license fees |
| 19. | no office supplies | no office supplies |
| 20. | no "website" fee | no "website" fee |
| 21. | no inspection fees | no inspection fees |
| 22. | no other expenses | no other expenses |

As noted above, the Defendants contend that all expenses, including all expenses of the type listed in the above table, are to be deducted in calculating the profit split. And this is so whether the property was rented before it was resold or not.

## 2. Version 2:

In testimony that Mr. Roberts gave in this Court during an earlier trial of a different adversary proceeding, he described a different version of his Investor Program. The earlier trial was held on July 16, 2013, in the case of *Ralph Roberts*

*Realty, LLC v. Roger and Shirley Roberts*, Adv. No. 12–6132 (the *"Roger Roberts* case").

In the *Roger Roberts* case, Ralph Roberts (no relation to Roger Roberts), testified as follows, regarding the Investor Program: [69]

[in answer to the question "In your program, what kind of expenses do you generally include as credits against the split?":] [70]

A: If you're buying it and fixing it and flipping it, all expenses are against it. If

69. Trial Tr. at 92–93.

70. *See* DX–R at 31–32. The Court notes that a transcript of Ralph Roberts's testimony given in the *Roger Roberts* case was marked during the trial of this case as DX–R, but the entire exhibit was not admitted into evidence. The testimony of Ralph Roberts that is quoted here is in evidence in this case, however, because during trial Mr. Roberts admitted to making this specific testimony in the *Roger Roberts* case. The entire transcript of Ralph Roberts's trial testimony in the *Roger Roberts* case is on file in that case at Docket # 64.

you're buying it and renting it, then there's taxes and insurance we don't count against it, but anything that has to take the property to be able to sell it would be an expense within reason. ...

Q: Are there any expenses that aren't included that you wouldn't include?

A: The investor's personal time. There's no expense for the investor's time, but everything else that's paid to someone, verified, paid to someone is an expense.

This Version ("Version 2") is quite different from Version 1, and more favorable to Defendants than Version 1, in the types of expense that are allowed as deductions in calculating the profit split. First, in Version 2, numerous types of expense are allowed that are not allowed for either flips or rentals under Version 1. These include those types of expense that are listed as item nos. 14, 15, and 21 in the Version 1 table above (legal fees; accounting fees; and inspection fees). Second, in Version 2, numerous types of expense are allowed for properties that were rented before being resold, that are not allowed for such properties in Version 1. These include item nos. 8, 9 and 13 in the Version 1 table above (cost of repairs; cost of improvements; and utilities).

### 3. Version 3:

Ralph Roberts testified to yet a third version of the Investor Program, in an affidavit he signed on October 7, 2013.[71] That affidavit was filed in this case by Realty on October 7, 2013, in support of its motion for summary judgment.[72] In that affidavit, Mr. Roberts testified as follows:

30. Under the terms of the investor program, investors were entitled to a credit against the net profit split for reasonable amounts spent to maintain or refurbish the property, as well as for taxes and utilities paid by the investor.

31. If, however, an investor rented a property, the rental income was to be credited against any expenses incurred by the investor on the property.

32. Because of the strength of the rental market, the incoming rent for all properties purchased through my company's investor program should more than offset, on a yearly basis, the expenses for each property.[73]

And at trial, Mr. Roberts reiterated the provisions of ¶ 31 of the affidavit, when he testified as follows:

Q: Can you show me in this affidavit that describes your procedural posture and dealings with Mr. Savoy where it talks about the rental agreement? ...

A: Well, 31 says if investors rented the property, the rental income would be credited against any expenses incurred by the investor on the property.[74]

This version ("Version 3") is quite different from Version 1 and also from Version 2. The first difference between Version 3 and Version 1, in calculating the profit split for a property that is resold after being rented, is that under Version 3 the investor is entitled to deduct all the same expenses that he can deduct for a property that is resold without first being rented (*i.e.*, a "flipped" property).

The second difference between Version 3 and Version 1, which also is a difference

---

**71.** This affidavit was marked as DX–S during trial, but the entire exhibit was not admitted into evidence. The testimony of Ralph Roberts that is discussed here is in evidence in this case, however; and during trial Mr. Roberts testified about it.

**72.** Docket # 40, Ex. A.

**73.** DX–S at ¶¶ 30–31.

**74.** Trial Tr. at 97–98.

between Version 3 and Version 2, is that under Version 3 the investor's rental income is factored into the profit calculation, and expenses are netted against the rental income. Not only is that a striking difference from Version 1 (the position Realty took at trial in this case) and Version 2, but also it is quite different from the. *Defendants'* version of the Investor Program agreement. That is, the Defendants' version of the agreement, testified to at trial by Defendant Jon Savoy, is that rental income is not considered at all in the profit calculation. At trial, the parties agreed, and the testimony of Ralph Roberts and Defendant Jon Savoy agreed, on this point. And the parties and their witnesses agreed at trial on the fact that under the Investor Program the investor keeps all the rental income obtained from renting a property before selling it. And none of the parties' competing profit/profit split calculations for any of the sixteen properties involved in this case include rental income at all.

### 4. The Court's findings and conclusions on this subject

As a general matter, the Court finds Ralph Roberts and Jon Savoy each to be a credible witness, even though their testimony is in sharp conflict on a number of issues. With respect to the method of calculating the profit and profit split on properties resold by Defendants, and specifically the types of expenses to be deducted in calculating the profit on a property, the Court finds and concludes that the Plaintiff Realty has failed to meet its burden of proving, by a preponderance of the evidence, that its version (Version 1) was what Realty and any of the Defendants orally agreed to. Ralph Roberts's testimony at trial on this subject was clearly

inconsistent with his prior sworn testimony given on two prior occasions, and all three versions sworn to by Mr. Roberts, at trial and prior to trial, are inconsistent with each other. At best, from Plaintiff Realty's perspective, the evidence on this subject is confused and confusing, and unpersuasive. The evidence fails to convince the Court that Realty's Version 1 more likely than not is what Realty and the Defendants orally agreed to.

This failure by Realty to meet its burden of proof on this issue means that in calculating the profit for each of the properties at issue the Court must use *Defendants'* profit calculations, with certain specific exceptions discussed below.

### C. The Court's calculations, for the properties at issue, of profit, profit split, and other amounts owed to Realty

As noted in part III.C of this opinion above, there were sixteen properties that Defendants purchased under their oral Investor Program agreement with Realty. For one reason or another, Realty seeks no relief against Defendants with respect to eight of the properties. These are: Breckenridge; Eastland; Palm Beach; Ursuline; Antonia; Foxcrest; Lowell; and Raymond.[75]

Realty seeks relief, either monetary or declaratory, with respect to the remaining eight properties listed in part III.C of this opinion. As of the time of trial, six of those properties had been resold by Defendants, including two sold on a land contract. These are: Engelman; Firwood; Ledgestone; Trailwood; Jimmy (land contract); and Duncan (land contract). The remaining two properties had not been resold as of the time of trial: Irene and Teppert.

---

**75.** There is a minor exception to this for Raymond, which is discussed in part IV.D of this   opinion, below.

The Court now will discuss each of the six sold properties separately. The table appended to the end of this opinion presents the Court's detailed findings relevant to the question of what, if anything, Defendants owe Realty for each property.

### 1. Ledgestone

■ The Ledgestone property was purchased at a Sheriff's foreclosure sale by Defendant Ryan Residential Properties Group, LLC, rented for a time, and then resold.

Adjustments the Court has made to the Defendants' calculation worksheet for this property (DX–J) are the following. First, the correct seller's fee is $5,000, not the $10,000 claimed by Defendants. The parties agreed to $5,000 for this fee, not $10,000, and this is so for all of the properties discussed in this opinion.[76] Second, of the expenses listed on DX–J, the Court does not include as allowable expenses the items for meals and entertainment; office supplies; service charges; or bad debt. There is no basis for including these items of expense here. These items total $251.09. Third, the Court does not include as an allowable expense the item listed as "Interest Expense" for $1,178.11. That item is for interest Defendants incurred to borrow money from a third party to purchase this property at the foreclosure sale. That is not an allowable expense under the parties' agreement. Interest is limited to the $2,248.92 interest amount shown at the bottom of DX–J, which represents interest on the money paid by Defendants to acquire this property at the foreclosure sale, for the period from that time to the time when the property was resold. That is an allowable expense deduction, for all the properties discussed in this opinion, under

the agreement of the parties, for both properties that were flipped and properties that were rented before they were resold. Fourth, the Court includes in the allowable expenses the $5,000 acquisition fee to Realty incurred for the acquisition of this property.

After making these adjustments, the net profit for the split is $1,927.71; the split due to Realty is 30% of that amount, which equals $578.31. Plus $2,500.00 of the acquisition fee due to Realty for this property is still unpaid, so that too is owed to Realty.[77] The total owed to Realty with respect to the Ledgestone property is $3,078.31.

Of the Defendants named in this case, this sum is owed to Realty by Defendants Ryan Residential Properties Group, LLC, Jon Savoy, and Arnold "Butch" Hassig, jointly and severally, and only them.

### 2. Firwood

The Firwood property was purchased at a Sheriff's foreclosure sale by Defendant Jon Savoy, transferred by him to one of his LLC entities, Defendant 1836 Brys, LLC, and then later resold. (PX–8). This property was not rented before it was resold.

Adjustments the Court has made to the Defendants' calculation worksheet for this property (PX–8) are similar to the ones described above with respect to the Ledgestone property, except that Defendants do not claim any expense for Firwood for meals and entertainment; office supplies; service charges; or bad debt. Nor do they claim a separate interest expense for any interest incurred to finance the purchase of the Firwood property.

Realty contends that the expense item "repairs and maintenance" of $31,387.73,

---

**76.** And Defendant Jon Savoy admitted this in his trial testimony. (*See* Trial Tr. at 175).

**77.** *See* PX–6.

claimed as an expense for Firwood, is unreasonably high. The Court finds otherwise, however, based on the testimony of Jon Savoy.[78]

After making these adjustments, there is no net profit for the split; rather, there is a loss of $5,705.70. For Firwood, $2,500.00 of the acquisition fee due to Realty for this property is still unpaid, so that amount is owed to Realty.[79] As discussed in part IV.G of this opinion, below, Defendants are not entitled to set off or recoup any part of their $5,705.70 loss on this property against the $2,500.00 acquisition fee still owed to Realty for this property. Therefore, the total owed to Realty with respect to the Firwood property is $2,500.00.

Of the Defendants named in this case, this sum is owed to Realty by Defendants 1836 Brys, LLC, Jon Savoy, and Arnold "Butch" Hassig, jointly and severally, and only them.

### 3. Trailwood

The Trailwood property was purchased at a Sheriff's foreclosure sale by Defendant Prime Residential Properties Group, LLC, rented for a time, and then resold.

Adjustments the Court has made to the Defendants' calculation worksheet for this property (DX–M) are similar to the ones described above with respect to the Ledgestone property, except that Defendants do not claim any expense for Trailwood for meals and entertainment; service charges; or bad debt. (A $46.37 item for office supplies is not counted as an allowable expense.) Nor do Defendants claim a separate interest expense for any interest incurred to finance the purchase of the Trailwood property.

After making these adjustments, the net profit for the split is $68,059.04; the split due to Realty is 30% of that amount, which equals $20,417.71. Plus the entire $5,000.00 acquisition fee due to Realty for this property is still unpaid, so that too is owed to Realty.[80] The total owed to Realty with respect to the Trailwood property is $25,417.71.

Of the Defendants named in this case, this sum is owed to Realty by Defendant Prime Residential Properties Group, LLC, Jon Savoy, and Arnold "Butch" Hassig, jointly and severally, and only them.

### 4. Engleman

The Engleman property was purchased at a Sheriff's foreclosure sale by Defendant Jon Savoy, transferred by him to Defendant 1836 Brys, LLC, rented for a time, and then resold.

Adjustments the Court has made to the Defendants' calculation worksheet for this property (DX–E) are similar to the ones described above with respect to the Ledgestone property, including disallowing the expenses claimed for meals and entertainment; office supplies; service charges, and "website," all of which total $70.93. (As with the other items just listed, there is no basis shown for allowing a website expense.) Nor do they claim a separate interest expense for any interest incurred to finance the purchase of the Engleman property.

Realty contends that the expense item "repairs and maintenance" of $18,675.27 claimed as an expense for Engleman is unreasonably high. The Court finds otherwise, however, based on the testimony of

---

**78.** Trial Tr. at 177–82.

**79.** *See* PX–6.

**80.** *See* PX–6.

Jon Savoy.[81]

After making these adjustments, there is no net profit for the split; rather, there is a loss of $37,245.12. For Engleman, $2,500.00 of the acquisition fee due to Realty for this property is still unpaid, so that amount is owed to Realty.[82] As with Firwood, Defendants are not entitled to set off or recoup any part of their loss on this property against the $2,500.00 acquisition fee still owed to Realty for this property. Therefore, the total owed to Realty with respect to the Engleman property is $2,500.00.

Of the Defendants named in this case, this sum is owed to Realty by Defendants 1836 Brys, LLC, Jon Savoy, and Arnold "Butch" Hassig, jointly and severally, and only them.

### 5. Duncan

The Duncan property was purchased at a Sheriff's foreclosure sale by Defendant Jon Savoy, transferred by him to Defendant 1836 Brys, LLC, and then resold. It was not rented before it was resold. It was resold on a 5-year land contract dated July 9, 2010. (PX–11). As of the time of trial, the land contract purchaser (vendee) was still making payments under the land contract.

Adjustments the Court has made to the Defendants' calculation worksheet for this property (DX–A) include ones similar to those described above with respect to the Ledgestone and Engleman properties, including disallowing the expenses claimed for meals and entertainment; office supplies; service charges, and website, all of which total $62.97, and disallowance of an interest charge of $264.22, for interest incurred to finance the purchase of the Duncan property.

Realty argues that the $7,417.87 expense claimed for "Legal" is not correct, because there were no legal fees incurred with respect to this property.[83] The Court agrees, so this expense item is disallowed.

Realty argues that because the land contract required the land contract purchaser to pay the property taxes and insurance on the Duncan property, those expenses listed by Defendants, in the amounts of $300.38 and $402.82 respectively, must be disallowed. But such items are allowed expenses for the roughly 9 month period from the acquisition of the property at the Sheriff's sale (October 9, 2009) until the July 9, 2010 date of the land contract. Realty has not demonstrated that the expense amounts claimed are for any post-land contract period.

After making these adjustments, the net profit for the split is $38,117.73; the split due to Realty is 30% of that amount, which equals $11,435.32. This is the amount is owed to Realty with respect to the Duncan property.

Of the Defendants named in this case, this sum is owed to Realty by Defendants 1836 Brys, LLC, Jon Savoy, and Arnold "Butch" Hassig, jointly and severally, and only them.

■ The final issue regarding this property is when the payment to Realty is due to be made. The Court described the apparent dispute between the parties about this issue, in part III.B of this opinion, above. The Court credits the testimony of Ralph Roberts on this issue, with respect to the Duncan property and the Jimmy property, both of which were resold on a land contract. Accordingly, the Court finds

---

81. Trial Tr. at 171–76.

82. *See* PX–6.

83. Trial Tr. at 69–70 (Roberts testimony).

that the $11,435.32 payment for the Duncan property is due to be made by the Defendants to Realty when the land contract balance is $11,435.32 or less, and payment may be made either in cash or by assigning the balance of payments due under the land contract to Realty. The Court will enter a declaratory judgment so declaring. (Realty did not prove that as of the time of trial, this payment due date for the Duncan property had occurred yet.)

### 6. Jimmy

The Jimmy property was purchased at a Sheriff's foreclosure sale by Defendant Jon Savoy, transferred by him to Defendant 1836 Brys, LLC, rented for a time, and then resold. It was resold on a 5-year land contract dated April 27, 2011.[84] As of the time of trial, the land contract purchaser (vendee) was still making payments under the land contract.

Adjustments the Court has made to the Defendants' calculation worksheet for this property (DX–D) include ones similar to those described above with respect to the Duncan property, including disallowing the expenses claimed for meals and entertainment; office supplies; service charges, and website, all of which total $72.97.

Realty argues that the $7,447.88 expense claimed for "Legal" is not correct, because there were no legal fees incurred with respect to this property.[85] The Court agrees, so this expense item is disallowed.

Realty argues that because the land contract required the land contract purchaser to pay the property taxes and insurance on the Duncan property, those expenses listed by Defendants, in the amounts of $3,945.32 and $833.90 respectively, must be disallowed. But such items are allowed expenses for the roughly 19 month period from the acquisition of the property at the Sheriff's sale (September 18, 2009) until the April 27, 2011 date of the land contract. Realty has not demonstrated that the expense amounts claimed are for any post-land contract period.

After making these adjustments, the net profit for the split is $7,887.14; the split due to Realty is 30% of that amount, which equals $2,363.14. Plus $2,500.00 of the acquisition fee due to Realty for this property is still unpaid, so that too is owed to Realty.[86] Plus Realty is owed $1,000.00, as reimbursement for money that Realty paid to the former owner of the Jimmy property to give up the property before the redemption period expired, in a "cash for keys" type deal. Realty advanced this money at Defendants' request.[87] The total owed to Realty for the Jimmy property, therefore, is $5,863.14.

Of the Defendants named in this case, this sum is owed to Realty by Defendants 1836 Brys, LLC, Jon Savoy, and Arnold "Butch" Hassig, jointly and severally, and only them.

As with the due date for the payment for the Duncan property, discussed above, the Court finds that the $2,363.14 profit split for the Jimmy property is due to be made by the Defendants to Realty when the land contract balance is $2,363.14 or less, and payment for that split amount may be made either in cash or by assigning the balance of payments due under the land contract to Realty. The Court will enter a declaratory judgment so declaring. (Realty did not prove that as of the time of trial, this payment due date for the Duncan property had occurred yet.) But pay-

---

84. PX–12.

85. Trial Tr. at 73 (testimony of Roberts).

86. *See* PX–6.

87. *Id.* at 45 (testimony of Roberts); PX–6.

ment of the $2,500.00 acquisition fee is overdue, as is reimbursement for Realty's $1,000.00 "cash for keys" advance. Thus, $3,500.00 is due to Realty now.

## D. The liability of Defendant Adam Residential Properties Group, LLC with respect to the Raymond property

Realty contends that Defendants owe it $906.80 as reimbursement for property taxes that Realty paid for the Raymond property. Realty's evidence shows that this amount is owed by, among others, Defendant Adam Residential Properties Group, LLC.[88] Defendants appear to dispute this, based on the testimony of Jon Savoy.[89] On this issue, the Court finds for Realty, and therefore finds that for this item the following Defendants are jointly and severally liable to Realty in the amount of $906.80: Adam Residential Properties Group, LLC; Jon Savoy, and Arnold "Butch" Hassig, jointly and severally, and only them.

## E. Summary of amounts owed to Realty, by which Defendants

Following is a summary of which Defendants are liable to Plaintiff Realty and in what amounts, based on the above findings:

- Defendants Jon Savoy, Arnold "Butch" Hassig, and Prime Residential Properties Group, LLC are jointly and severally liable to Plaintiff Realty in the amount of $25,417.71, for the Trailwood property.
- Defendants Jon Savoy, Arnold "Butch" Hassig, and Ryan Residen-

tial Properties Group, LLC are jointly and severally liable to Plaintiff Realty in the amount of $3,078.31, for the Ledgestone property.

- Defendants Jon Savoy, Arnold "Butch" Hassig, and 1836 Brys, LLC are jointly and severally liable to Plaintiff Realty in the total amount of $22,298.46, for the Firwood, Engleman, Duncan, and Jimmy properties.
- And Defendants Jon Savoy, Arnold "Butch" Hassig, and Adam Residential Properties Group, LLC are jointly and severally liable to Plaintiff Realty in the amount of $906.80.

Thus, the joint and several liability of Defendants Jon Savoy and Arnold "Butch" Hassig to Plaintiff Realty totals $51,701.28 for the six sold properties discussed above plus the $906.80 advanced by Realty for the Raymond property.

■■ The Court will not include in its judgment any provision for prejudgment interest. Plaintiff Realty did not request prejudgment interest, in its Complaint;[90] in the Final Pretrial Order;[91] in opening or closing arguments at trial;[92] or in Realty's post-trial briefs.[93] As a result, the Court will not consider exercising its discretion to award prejudgment interest. *See generally Global Technovations, Inc. v. Onkyo U.S.A. Corp.*, 431 B.R. 739, 774–76 (Bankr. E.D. Mich. 2010), *aff'd*, 2011 WL 1297356 (E.D. Mich. 2011), *aff'd*, 694 F.3d 705 (6th Cir. 2012) (discussing the bankruptcy court's discretion in deciding whether or not to award prejudgment interest). But post-judgment interest will ac-

---

88. PX-6, pp. 1, 2; Trial Tr. at 45–46 (testimony of Roberts).

89. Trial Tr. at 196.

90. Docket # 1.

91. Docket # 36.

92. *See* Docket ## 61, 67.

93. Docket ## 62, 64.

crue on the judgment at the federal statutory rate in effect as of the date of entry of the judgment. *See* 28 U.S.C. § 1961(a).

No amounts are owed to Realty by the Defendant Adam Hassig; Realty presented no evidence to prove that Adam Hassig owes anything.

### F. Realty's request for a declaratory judgment regarding the two unsold properties—Irene and Teppart

▮ The last two properties about which Realty seeks relief are the Irene and Teppart properties, which had not yet been resold by Defendants at the time of trial. Plaintiff Realty does not seek a money judgment regarding these properties yet, but rather seeks a declaratory judgment in which the Court makes various findings about these properties, including findings about expenses incurred as of the time of trial by Defendants.

In its discretion, the Court declines to grant any declaratory relief specifically about these properties at this time. *See generally Wilton v. Seven Falls Co.*, 515 U.S. 277, 286–87, 115 S.Ct. 2137, 132 L.Ed.2d 214 (1995) (discussing the discretion federal courts have in deciding whether or not to issue declaratory relief); *Western World Ins. Co. v. Hoey*, 773 F.3d 755, 758–59 (6th Cir. 2014) (same). In the Court's view, it is sufficient to note that the Court's findings and conclusions made in this opinion, about the terms and details of the oral Investor Program agreement between Realty and the Defendants in this case, and about any and all other issues that may be relevant, will apply and be binding on Plaintiff Realty and each of the Defendants in this case in any future litigation that may occur about these sub-

jects, under the doctrine of collateral estoppel. *See generally Allstate Insurance Co. v. Harris* (*In re Harris*), 480 B.R. 281, 287–88 (Bankr. E.D. Mich. 2012). That should suffice, with respect to the Irene and Teppert properties.

### G. Defendants' setoff and recoupment defenses

▮ Defendants allege that under the Investor Program, they have the right to deduct any losses they suffer on any property from the profits they make on any other property. Defendants allege that, based on that contract right, they "are entitled to a setoff of $65,194.17 pursuant to losses from Engleman, Eastland, Firwood, and Ledgestone [against any monies allegedly owed Plaintiff for profits made under the Investor Program]." [94]

Plaintiff Realty alleges that the "[I]nvestor [P]rogram does not contain any provision for the setoff of losses on one property against future profits on another property." [95] Realty alleges further that, even assuming such a contractual provision exists, the Defendants are precluded from asserting any right of setoff for the following reasons:

(1) Each purchase of a property under the Investor Program "is a separate transaction, and separate transactions may not be aggregated for setoff purposes;" [96]

(2) Defendants' failure to timely file a proof of claim precludes them from asserting any right of setoff; [97]

(3) Debtor's confirmed Plan bars Defendants from asserting any setoff

---

**94.** Defs.' Post–Trial Br. (Docket # 63) at 10–11.

**95.** Pl.'s Post–Trial Br. (Docket # 62) at 20.

**96.** *Id.*

**97.** *Id.*

rights;[98]

(4) "[T]he Properties were purchased by different Defendants, and therefore, the alleged losses suffered by one Defendant may not be setoff against profits received by a different Defendant;"[99] and

(5) "[T]he alleged pre-petition losses may not be set off against postpetition profits."[100]

The Court finds and concludes that under their oral agreement with Realty, (1) Defendants do not have any right to deduct any losses they suffer on any given property from what they otherwise owe to Realty for a profit split on another property; (2) nor may Defendants deduct any such losses from any acquisition fee they otherwise owe to Realty, on either the same property or on any different property; and (3) nor do Defendants have any valid claim against Realty, under any legal theory, for any losses they suffered or suffer on any property.

Defendants have none of these rights or claims against Realty because, the Court finds, they simply were not part of the agreement between the parties. No such loss-sharing was part of the agreement of the parties.

Ralph Roberts testified that he never discussed the subject of loss-sharing with Defendants, and did not agree to any sort of loss sharing with Defendants.[101] Defendant Jon Savoy, on the other hand, testified that Ralph Roberts agreed that Realty would be responsible to Defendants for 100% of any losses Defendants suffered on any property.[102]

The Court credits the testimony of Ralph Roberts on this issue, and finds that Ralph Roberts's version of the parties' oral agreement on this issue is more credible and plausible than Jon Savoy's version. And the Court finds Ralph Roberts's version to be consistent with the prior testimony he gave on this subject in the *Roger Roberts* case trial and in his summary judgment affidavit filed in this case.

In his summary judgment affidavit filed in this case, Ralph Roberts testified that "[t]he investor program does not contain any provision for the splitting of losses on properties."[103] During his trial testimony in this case, Mr. Roberts explained, credibly and plausibly, that when he made that statement in his affidavit, he was thinking of and addressing specifically his oral Investor Program agreement with the Defendants in this case.

On the other hand, Ralph Roberts testified during the *Roger Roberts* case trial that under the Investor Program Realty shares 50% of the loss if an investor has a loss on a property.[104] During his trial testimony in this case, Mr. Roberts explained, credibly and plausibly, that in this testimony he was referring to a later version of the Investor Program, which applied to later and other investors, not to Defendants in this case.[105] As Mr. Roberts explained, the Defendants here were the first investors in Realty's Investor Program after that program began in June 2009, with the possible exception of Raymond Confer, and the deal Mr. Roberts made with the

**98.** Pl.'s Post–Trial Br. (Docket # 62) at 20; Pl.'s Reply (Docket # 64) at 3.

**99.** Pl.'s Post–Trial Br. (Docket # 62) at 20.

**100.** *Id.*

**101.** *E.g.*, Trial Tr. at 29, 32, 87–88.

**102.** *Id.* at 160–61.

**103.** DX–S and Docket # 40, Ex. A, at ¶ 23.

**104.** DX–R at 22.

**105.** Trial Tr. at 28–29, 94–96.

Defendants here was different, and in at least two important ways, more generous to the investors than the deal made with later investors. The Defendants here had a different and better deal, in that they only had to pay Realty 30% of the profit on a property, compared to the 50% profit split that later investors had to pay Realty. And the Defendants here got a $5,000 seller's fee credited to them on every property, and were able to deduct that $5,000 fee from the profit for purposes of calculating the profit split. No other investors got that deal.[106]

The Court finds Ralph Roberts's trial testimony on the subject of loss-sharing and losses to be credible, and finds that Realty has met its burden of proving that the oral Investor Program agreement between Realty and Defendants in this case did not include any provision for sharing of losses on any property. Rather, under the oral agreement in this case, if Defendants suffered a loss on any given property, the only legal consequence of that was that, Defendants did not owe a profit split to Realty for that property. Defendants did not and do not have a valid claim against Realty if they suffered a loss on any property, or any right to setoff or recoup such loss against any amount owed for any other property. Nor did Defendants have a right to withhold payment of any part of the acquisition fee on a property because that property turned out to be a loss for Defendants.

For these reasons, Defendants' setoff/recoupment defenses fail, and it is not necessary for the Court to discuss or decide Realty's other arguments about setoff and recoupment.

**H. Defendants' other defenses**

Defendants have argued other defenses in this case, but the Court rejects them as unproven, contrary to the evidence the Court finds persuasive, and without merit.

First, Defendants argue that there was no "meeting of the minds" on material contract terms, and therefore no enforceable contract. The Court finds otherwise, however, based on the evidence.

Second, Defendants claim that their oral agreement included a right of first refusal, as against other potential investors, on the purchase of any property, and that Realty breached this agreement term. Based on the testimony of Ralph Roberts,[107] however, the Court finds that this was not part of the agreement between Realty and the Defendants.

Third, Defendants contend that Realty had a contractual duty to find profitable properties for Defendants, and that Realty breached that duty with respect to several properties that Defendants acquired and suffered losses on. But the Court finds that Realty had no such contractual duty. And there was no guarantee or requirement that properties would all be profitable that was part of the agreement between Realty and Defendants. Profit on every property certainly was everyone's hope, but it was not guaranteed.

Defendants' other arguments claiming various breaches by Realty of the parties' agreement are not supported by the evidence; rather, they are refuted by the evidence, and so the Court rejects them.

**V. Conclusion**

For the reasons stated in this opinion, the Court will enter a separate judgment that is consistent with this opinion.

Attachment

---

**106.** *Id.* at 26.

**107.** *Id.* at 20.

| | Property | Purchased by: | Disposition (rented; resold; resold on land contract) | Acquisition Fee Paid: | Acquisition Fee Still Due: | Net Profit for split: | | 30% split due to Realty: or other amount due to Realty: | Total now due to Realty: |
|---|---|---|---|---|---|---|---|---|---|
| 1 | 50054 S. Jimmy Ct Chesterfield, MI (PX-12; DX-D) | Jon Savoy 1836 Brys, LLC | rented 12 months, then resold on land contract | $2,500.00 | $2,500.00 | Resold for: | $50,001.00 | | |
| | | | | | (PX-8) | Purchased for: | $16,627.84 | | |
| | | | | | | Gross Profit: | $33,373.16 | | |
| | | | | | (DX-D) | Less Allowable Expenses: | $19,996.02 | | |
| | | | | | | Less $5,000 Seller's Fee: | $5,000.00 | | |
| | | | | | | Less $500 Closing Fee: | $500.00 | | |
| | | | | | | Net Profit for split: | $7,877.14 | $2,363.14 | |
| | | | | | Other amount due to Realty: | Realty paid $1,000 in "cash for keys" deal with foreclosed owner, to be reimbursed by Savoy (PX-12, PX-8) | | $1,000.00 | $5,863.14 |
| 2 | 32404 Firwood Warren, MI (PX-8) | Jon Savoy 1836 Brys, LLC | resold, not rented | $2,500.00 | $2,500.00 | Resold for: | $84,900.00 | | |
| | | | | | | Purchased for: | $28,288.73 | | |
| | | | | | | Gross Profit: | $56,611.27 | | |
| | | | | | (PX-8) | Less Allowable Expenses: | $56,816.97 | | |
| | | | | | | Less $5,000 Seller's Fee: | $5,000.00 | | |
| | | | | | | Less $500 Closing Fee: | $500.00 | | |
| | | | | | | Net Profit for split: | -$5,705.70 | none | $2,500.00 |
| 3 | 36403 Ledgestone Clinton Twp., MI (PX-7; DX-J) | Ryan Residential Properties Group, LLC | rented, then resold | $2,500.00 | $2,500.00 | Resold for: | $69,900.00 | | |
| | | | | | | Purchased for: | $23,501.00 | | |
| | | | | | | Gross Profit: | $46,399.00 | | |
| | | | | | (DX-J) | Less Allowable Expenses: | $38,971.29 | | |
| | | | | | | Less $5,000 Seller's Fee: | $5,000.00 | | |
| | | | | | | Less $500 Closing Fee: | $500.00 | | |
| | | | | | | Net Profit for split: | $1,927.71 | $578.31 | $3,078.31 |
| 4 | 33221 Duncan Fraser, MI (PX-11; DX-A) | Jon Savoy 1836 Brys, LLC | resold on land contract | $5,000.00 | $0.00 | Resold for: | $84,900.00 | | |
| | | | | | | Purchased for: | $24,317.07 | | |
| | | | | | | Gross Profit: | $60,582.93 | | |
| | | | | | (DX-A) | Less Allowable Expenses: | $16,965.20 | | |
| | | | | | | Less $5,000 Seller's Fee: | $5,000.00 | | |
| | | | | | | Less $500 Closing Fee: | $500.00 | | |
| | | | | | | Net Profit for split: | $38,117.73 | $11,435.32 | $11,435.32 |
| 5 | 7376 Engleman Centerline, MI (PX-10, DX-E) | Jon Savoy 1836 Brys, LLC | rented, then resold | $2,500.00 | $2,500.00 | Resold for: | $28,000.00 | | |
| | | | | | | Purchased for: | $17,627.00 | | |
| | | | | | | Gross Profit: | $10,373.00 | | |
| | | | | | (DX-E) | Less Allowable Expenses: | $42,118.12 | | |
| | | | | | | Less $5,000 Seller's Fee: | $5,000.00 | | |
| | | | | | | Less $500 Closing Fee: | $500.00 | | |
| | | | | | | Net Profit for split: | -$37,245.12 | none | $2,500.00 |
| 6 | 29179 Trailwood Warren, MI (PX-9; DX-M) | Primo Residential Properties Group, LLC | rented, then resold | $0.00 | $5,000.00 | Resold for: | $168,000.00 | | |
| | | | | | | Purchased for: | $59,800.70 | | |
| | | | | | | Gross Profit: | $108,199.30 | | |
| | | | | | (DX-M) | Less Allowable Expenses: | $34,640.76 | | |
| | | | | | | Less $5,000 Seller's Fee: | $5,000.00 | | |
| | | | | | | Less $500 Closing Fee: | $500.00 | | |
| | | | | | | Net Profit for split: | $68,059.04 | $20,417.71 | $25,417.71 |